AMP, INCORPORATED, The Whitaker Corporation, Plaintiffs,

v.

FUJITSU MICROELECTRONICS, INC., Fujitsu Limited, Defendants.

Civ. A. No. 1:CV–93–361.

United States District Court, M.D. Pennsylvania.

April 25, 1994.

David E. Lehman, Harrisburg, PA, Jack C. Goldstein, Thomas A. Miller, J. Mike Amerson, Arnold, White & Durkee, Russell T. Wong, Arnold, White & Durkee, Houston, TX, for AMP, Inc., The Whitaker Corp.

William W. Warren, Jr., Saul, Ewing, Remick & Saul, Harrisburg, PA, Brian G. Brunsvold, Albert J. Santorelli, Don O. Burley, David L. Soltz, Donald C. Kordich, Roger D. Taylor, Finnegan Henderson Farabow, Garrett & Dunner, Washington, DC, for Fujitsu Microelectronics, Inc., Fujitsu Ltd.

*MEMORANDUM*

CALDWELL, District Judge.

We are considering Defendants' five motions, four for partial summary judgment, and one to determine that certain documents are not privileged, and Plaintiffs' three motions, one for partial summary judgment, one to compel, and one for a protective order. We exercise jurisdiction according to 28 U.S.C. § 1338.

## I. *Facts*

This case revolves around U.S. Patent No. 4,762,500 (the "'500 patent"). The patent describes an electrical connector used to connect printed circuit boards in electronic systems.[1] Such connectors are often used in computer systems. Various computer components—such as chips—are mounted on circuit boards that provide physical support for the components and allow the different components on a given board to communicate with one another electronically. The product described in the '500 patent connects circuit boards, allowing electronic communication between components on separate circuit boards.

A circuit board connector can include a number of signal conductors, which actually relay electronic information between printed circuit boards. These relay information in a binary fashion, meaning that the information is transmitted in a series comprised of the numbers "1" and "0." In one example offered by Defendants, a five-volt current applied to a signal conductor might translate to a binary "1" while a zero-volt current (or ground) would represent a "0." Another part of the connector is what Defendant calls "a conductive portion." This pathway between circuit boards does not itself transmit information; rather, it maintains a constant current of electricity at a particular voltage, which is necessary to the proper functioning of the connector.[2]

When the signal to be transmitted is of high frequency, it is desirable to have "con-

---

1. This description is drawn from uncontested parts of Defendant's statement of material facts not in dispute.

2. The parties disagree as to particular aspects of this "conductive portion." We have attempted to draw our description in a way that reflects the claims of both parties.

trolled impedance" through the length of the connector.[3] A "matched impedance" connector is one in which the impedance of the connector approximates that of the printed circuit boards it connects. Impedance itself is at least in part a function of the geometry of the connector. The '500 patent describes three common electrical geometries—coaxial, microstrip, and stripline—that allow matched impedance.

The '500 patent discloses two embodiments of microstrip connectors, one for connecting printed circuit boards that are lying parallel to one another and one for connecting circuit boards that lie at right angles to one another. In both embodiments, the housing, contacts, and ground plane (or ground bus) portions of one half of the connector mate with the same three elements of the other connector half in a male-female connection. In the patented product, the rows of signal terminals are spaced apart from the ground plane by a layer of insulation known as dielectric material. In order to facilitate microstrip transmission with controlled impedance, the signal and ground conductors must be electronically parallel.

On December 4, 1986, Steven Feldman and Frank Dola filed patent application No. 937,-797, which eventually led to the issuance of the '500 patent. The application included 30 claims.[4] On May 4, 1987, the Patent and Trademark Office rejected all 30 claims because the examiner determined that they were obvious, 35 U.S.C. § 103, in light of the teachings of U.S. Patent No. 4,616,893 and other prior art references. Patent No. 4,616,893 (the "Feldman patent" or "'893 patent") had been issued to Mr. Feldman as the sole inventor.

Plaintiff AMP Incorporated ("AMP"), to whom the Feldman patent had been assigned

and for whom Feldman and Dola filed the application for the '500 patent, responded to the rejection by arguing that the product claimed in the application was fully disclosed in the Feldman patent. Therefore, AMP argued, the new application did not describe an obvious invention and, in fact, deserved to be accorded the same filing date as the Feldman patent. See Defendant's Statement of Material Facts at ¶ 11. AMP also amended Claim 15 of the application (Claim 9 of the '500 patent) to avoid prior art by adding a requirement that the connector be comprised of mateable halves. Nearly two months later, the examiner withdrew his rejections based on the Feldman patent.

In an amendment after final rejection, mailed November 24, 1987, Claim 9 of the application (Claim 5 of the '500 patent) was amended to overcome a rejection that the claim was not enabling and that it did not particularly claim an invention. As with the prior amendment, this one primarily added the requirement that the connector be comprised of mateable halves.

■■■ The Feldman patent itself does not disclose a female mating bus portion for the connector. The parties agree that Mr. Dola conceived and invented the specific configuration of the opposed plates and spring means on the female bus bar shown in Figure 3 of the '500 patent. Plaintiffs, however, deny that Mr. Dola invented the basic notion that there should be a mating female bus bar; rather, they seem to argue that the general idea was Mr. Feldman's and that Mr. Dola conceived the particular configuration disclosed in the '500 patent. Additionally, Plaintiffs deny that the particular idea conceived by Mr. Dola is *claimed* in Claims 5 and 9 of the '500 patent.[5] Further, Plaintiffs

---

**3.** Impedance is a characteristic of electrical systems that refers generally to resistance to the flow of electricity.

**4.** Claims are the numbered descriptions in a patent that fully describe the product which is protected.

**5.** In patent law, the claims set out the metes and bounds of the invention, in effect carving out the intellectual property claimed by the patent holder. See Robert L. Harmon, Patents and the Federal Circuit § 1.1(b) (2d ed. 1991 and supp.

1993). The claims are the formal limitations on the invention. At the same time he sets down his claims, the inventor must offer a specification that teaches a person ordinarily skilled in the art how to make and use the claimed invention. *Id.* at § 5.1. Further, an inventor must disclose the best way known to him to practice the invention claimed in the patent. *Id.* Thus, in the instant case, it seems that Plaintiffs are arguing that the Dola contribution, while disclosed in the '500 patent as the best way to practice the invention,

deny that Mr. Dola conceived or invented any of the matter claimed in Claims 5 and 9.

Plaintiffs AMP and The Whitaker Corporation claim that Defendants Fujitsu Microelectronics, Inc., and Fujitsu Limited (collectively, "Fujitsu") infringed the '500 patent.

## II. *Law and Discussion*

### A. *Standard for Summary Judgment*

■ Summary judgment is appropriate when there remain no genuine issues as to any material facts and judgment may be entered as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When a movant submits that there is no genuine issue as to a material fact, its opponent must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd., et al v. Zenith Radio Corp., et al,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### B. *Defendants' Motion for Partial Summary Judgment That Claims 5 and 9 of the '500 Patent Are Invalid According to 35 U.S.C. § 103 and Plaintiffs' Motion That Claims 5, 6, and 9–13 Are Not Invalid According to 35 U.S.C. § 103*

Defendants argue that Claims 5 and 9 of the '500 patent are invalid because they are obvious according to 35 U.S.C. § 103.[6] The essence of Defendants' motion is that the teachings of two prior art patents, the Feldman patent and the Japanese Utility Model No. 49–6543 ("Utility Model"), render Claims 5 and 9 obvious. Plaintiffs have filed a motion for partial summary judgment that Claims 5, 6, and 9–13 are not invalid for obviousness because of the teachings of the Feldman patent or those of a series of 1985 AMP presentations. To the extent Plaintiffs' motion refers to the Feldman patent, we consider it a cross-motion to Defendants' motion.

is not actually claimed in Claims 5 and 9 of the '500 patent.

**6.** Plaintiffs have stipulated that, if we determine that Claims 5 and 9 are invalid, it would follow

### 1. *Obviousness*

■ Both at common law and in the various patent statutes, there are three requirements for a patent: the product had to have utility, it had to be novel, and it had to be nonobvious (for an excellent discussion of these patent requirements, *see* Dorothy Whelan, *A Critique of the Use of Secondary Considerations in Applying the Section 103 Nonobviousness Test for Patentability,* 28 B.C.L.Rev. 357 (1987)). The utility requirement is found in the current statute at 35 U.S.C. § 101 and simply requires that the claimed invention be "new and useful." The novelty requirement is found in the numerous subsections of 35 U.S.C. § 102 and requires that the product be new and that the person who seeks the patent actually be the inventor. Finally, the nonobviousness requirement is found in 35 U.S.C. § 103 and requires that the product represent some level of inventiveness; to wit, that it would not have been obvious to a person of ordinary skill in the art with knowledge of the previous products in that field.

■ The requirement that an item to be patented be "nonobvious" is, in reality, a requirement that the item truly be an "invention," not simply something that logically follows previous inventions. *Hotchkiss v. Greenwood,* 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1851).

■ The United States Supreme Court laid down the appropriate test for obviousness in *Graham v. John Deere,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

Under § 103, [1] the scope and content of the prior art are to be determined; [2] differences between the prior art and the claims at issue are to be ascertained; [3] and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as [4] commercial success, long felt but unsolved needs, fail-

that Claims 6 and 10–13 (which are dependant on Claims 5 and 9) are also invalid. *See* Goldstein Letter to the Court of 1/18/94 (Exh. A to Declaration of J. Mike Amerson).

ure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*Id.* at 17–18, 86 S.Ct. at 694 (numbers added). The secondary considerations have become almost a fourth tier in the analysis. *See,* Kirk M. Hartung, *'Prior Art': The Undefined Key to Section 103 of the 1952 Patent Act,* 32 Drake L.Rev. 703, 708 (1983); *Vandenberg v. Dairy Equip. Co.,* 740 F.2d 1560 (Fed.Cir.1984). We must examine the challenged invention and the prior art as a whole, *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367 (Fed.Cir.1986), and determine if the prior art suggests the challenged subject matter. *Cable Elec. Prods., Inc. v. Genmark, Inc.,* 770 F.2d 1015 (Fed.Cir.1985). The usual burden on a party seeking summary judgment does not fully describe a movant's burden in a patent validity challenge; because a presumption of validity attaches to the issuance of a patent by the Patent and Trademark Office, the movant must meet a clear and convincing evidence standard. *Scripps Clinic & Research Foundation v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed.Cir.1991); *Yenzer v. Agrotors, Inc.,* No. 90–1950, 1991 WL 340603 at *1 (M.D.Pa. Dec. 10, 1991) (Rambo, J.).

As a threshold matter, we note that we must apply the *Deere* test from the perspective of a person of ordinary skill in the art, *Environmental Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693 (Fed.Cir.1983), viewing the prior art at the time the challenged invention was made. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.,* 776 F.2d 281 (Fed.Cir.1985).

### 1. *Level of Skill*

As noted, one of the major considerations in an obviousness analysis is the level of ordinary skill in the pertinent art. *John Deere, supra,* 383 U.S. at 17–18, 86 S.Ct. at 693–94. A determination of the level of skill provides the perspective from which we are to view the prior art. *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132 (Fed. Cir.1985). The question of who constitutes the ordinary level of skill in the pertinent art is one of fact. *Custom Accessories, Inc. v.*

*Jeffrey–Allan Industries, Inc.,* 807 F.2d 955, 958 (Fed.Cir.1986). In bringing their motion, Defendants have not offered any evidence as to the relevant level of skill in the pertinent art—indeed, they have not even defined the pertinent art. When challenged on this issue by Plaintiffs, Defendants respond:

... the Court of Appeals for the Federal Circuit has held that a separate factual determination into the level of ordinary skill in the art is not required, when [sic], as here, the patent and prior art are easily understandable.

Defendants' Brief in Reply at 10–11 (citation omitted), *citing Chore–Time Equipment, Inc. v. Cumberland Corp.,* 713 F.2d 774, 779 (Fed. Cir.1983). We agree with the principle set forth in *Chore–Time,* but find it inapplicable here. The *Chore–Time* court held that:

... there is no genuine issue respecting the level of skill in the art. Chore–Time has not shown error in Judge Wilson's determination that because the subject matter of the patent and the prior art were in this case so easily understandable, a factual determination of the level of skill in the art was unnecessary.

713 F.2d at 779. In *Chore–Time,* the Court considered a poultry feeder that was, from even a lay perspective, simple to understand. In the instant case, we are confronted with a complex electronic system. Given the highly technical nature of the patent at issue in this case, we would be reluctant to make an obviousness determination without guidance. This finding is in accord with other courts construing *Chore–Time. See, e.g., Imperial Chemical Industries, PLC v. Danbury Pharmacal, Inc.,* 745 F.Supp. 998, 1010–11 (D.Del. 1990) ("In certain situations, such as simple and easily understandable technology, a specific finding on the level of ordinary skill in the art is unnecessary because the prior art itself reflects the level of ordinary skill.... This case deals with complex pharmaceutical chemistry and not simple technology which even a layman would comprehend."); *see also, Yenzer v. Agrotors, Inc., supra.*

Having made that determination, we conclude that there remains a genuine issue as to a material fact such that summary judg-

ment on the ground advanced by Defendants is inappropriate.

That determination, however, does not end the inquiry because Plaintiffs have moved for partial summary judgment (or, perhaps, summary adjudication) that certain alleged prior art references are not appropriately considered in an obviousness challenge to the validity of the '500 patent. Were we to grant Plaintiffs' motion, Defendants could not use those references at trial to establish that certain claims of the '500 patent are obvious. 35 U.S.C. § 103.

### 2. *The Prior Art*

Plaintiffs apparently do not contest that the Utility Model is prior art to the '500 patent. They agree that it was first published in February, 1974. *See* 35 U.S.C. § 102(b).

The dispute arises with regard to the Feldman patent and a 1985 presentation made by AMP.

#### a. *The 1985 Presentation*

 In the Fall of 1985, AMP made presentations to various companies regarding some of the ideas that related to the microstrip connectors it was then developing. Plaintiffs maintain that those who attended the presentations were under an obligation of confidence, that there were no sales or offers of sale at that time, and that there was no public use as defined by 35 U.S.C. § 102.

First, we agree with Plaintiffs that Defendants have not countered their argument that there were no sales or offers of sale. *See* Local Rule 7.6. Thus, we will grant summary adjudication that the 1985 presentations were not sales or offers for sale as defined in 35 U.S.C. § 102(b).

Second, we address whether the 1985 presentations were public uses within the meaning of § 102(a) or (b). Plaintiffs argue that all those who attended the presentations were subject to a confidentiality agreement.

*See* Deposition of Frank Pertschi, AMP employee, at 51.[7] Defendants reply that the existence of a confidentiality agreement is not dispositive of the public use question. *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1266 (Fed.Cir.1986). In *Moleculon,* the Federal Circuit allowed that a confidentiality agreement, or the lack of one, is one factor for a court to consider in determining whether a use was public. *Id.; TP Laboratories v. Professional Positioners, Inc.*, 724 F.2d 965, 972 (Fed.Cir.1984). In the instant case, we find that the confidentiality agreement weighs heavily against the 1985 presentations having been public uses.

Plaintiffs also contend that Defendants can offer no details about what product or concept was discussed at those presentations. Defendants respond that certain circumstantial pieces of evidence lead inescapably to the conclusion that a certain "bow-tie" version of the connector was discussed. *See* Declaration of David L. Soltz at ¶ 11. Plaintiffs answer that the declaration of counsel, made without personal knowledge, is of no moment. While generally this is so, the declaration points to certain evidence that is potentially meaningful. The declaration notes that the preliminary investigation disclosure ("PID") attached as Exh. 1 to Mr. Feldman's declaration indicates that the "bow-tie" connector was the current version of the AMP connector at the time of the meetings. *Id.* Additionally, it is perhaps important that Plaintiffs do not offer evidence that the "bow-tie" connector was not discussed; rather, they argue that Defendants have no evidence that it was. Defendants have now offered at least that modicum of meaningful evidence necessary to demonstrate the presence of a factual issue. Thus, this issue can not form the basis for summary adjudication.

 We return, however, to the fact that the presentations were made under confidentiality agreements. Public use is to be determined with regard to the totality of the

7. Defendants argue that the existence of the confidentiality agreement is in question and offer the declaration of counsel that Plaintiffs have been unable to produce a written agreement. The fact that Plaintiffs have offered no written agreement does not run counter to the sworn testimony, based on the personal knowledge of someone who attended the presentations, that there was at least an oral agreement. *See* Pertschi Depo., *supra.* Defendants have not demonstrated that a factual issue remains as to whether there was a confidentiality agreement; therefore, we accept that there was one and question the legal effect of it.

circumstances. *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 549 (Fed. Cir.1990); *see also, National Research Development Corp. v. Varian Associates, Inc.,* No. 93–1421, 1994 WL 18963 at *2–3 (Fed. Cir. Jan. 26, 1994). In addition to the confidentiality requirement, the AMP presenters gave those in attendance no samples or written material detailing the concept. A public use means the dissemination of an idea without substantive restriction. *W.L. Gore & Assoc., Inc. v. Garlock, Inc.,* 721 F.2d 1540 (Fed.Cir.1983). Here, the restrictions were clear and the attempt to disseminate information was considerably limited. We find that Plaintiffs have sustained their burden of proving that, as a matter of law, the 1985 presentations were not public uses as defined in 35 U.S.C. § 102. We will grant summary adjudication on this issue.

### b. *The Feldman Patent*

With regard to the Feldman patent, the parties point to 35 U.S.C. § 102(e) as the pertinent statute for determining whether the Feldman patent was prior art to the '500 patent.

A person shall be entitled to a patent unless—

 \* \* \* \* \* \*

(e) the invention was described in a patent granted on an application for patent *by another* filed in the United States before the invention thereof by the applicant for patent

 . . . . .

35 U.S.C. § 102 (emphasis added). Thus, if the Feldman patent were that of *another,* it could be prior art to the '500 patent and could, therefore, be considered in an obviousness analysis.

We focus, as do the parties, on the question of whether Mr. Dola, the listed co-inventor of the invention memorialized in the '500 patent, contributed to the ideas *claimed* in Claims 5, 6, and 9–13. Plaintiff argues that he did not, and that his contribution was to certain ideas *disclosed* in the patent, but not *claimed. See, supra,* n. 5. Thus, Plaintiffs

contend, with regard to Claims 5, 6, and 9–13, the Feldman patent is not "by another" because Mr. Feldman alone invented what is claimed in the asserted claims of the '500 patent.

Title 35 U.S.C. § 116 declares that

When an invention is made by two or more persons jointly, they shall apply for patent jointly and each make the required oath, except as otherwise provided in this title. Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or *(3) each did not make a contribution to the subject matter of every claim of the patent.*

35 U.S.C. § 116. This language incorporates an amendment to § 116 made in 1984.[8] Prior to the amendment, the section held that

When an invention is made by two or more persons jointly, they shall apply for patent jointly and each sign the application and make the required oath, except as otherwise provided in this title.

■ In adding to § 116 the language in the amendment, Congress intended to adopt the rationale of the court in *Monsanto Co. v. Kamp,* 269 F.Supp. 818 (D.D.C.1967), and reject a line of cases that had developed an "all claims" rule. *See* W. Fritz Fasse, *The Muddy Metaphysics of Joint Inventorship: Cleaning Up After The 1984 Amendments To 35 U.S.C. § 116,* 5 Harv.J.L. & Tech. 153 (1992). The "all claims" rule required that, in a joint patent, each inventor must contribute to the subject matter of each claim. *See, e.g., In re Sarett,* 327 F.2d 1005 (C.C.P.A. 1964). The 1984 amendment rejected the rule. Plaintiffs argue that the amended § 116 allows a joint patent where each of the joint inventors contributed to some part of the patent, but not necessarily to each claim; thus, they extrapolate that each claim might have separate inventors. The legislative history supports such a conclusion.

Subsection (a) of section 105 [§ 116] increases the likelihood that different claims of a patent may have different dates of

---

8. The amendment became effective on November 8, 1984, and the parties do not dispute that it is applicable to the '500 patent, the application for which was filed December 4, 1986.

invention, even though the patent covers only one independent and distinct invention within the meaning of 35 U.S.C. § 121. When necessary, the Patent and Trademark Office or a court may inquire of the patent applicant or owner concerning the inventors and the invention dates for the subject matter of the various claims.

*Section–By–Section Analysis: Patent Law Amendments of 1984,* 130 Cong.Rec. H10525 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5827, 5835. Thus, we agree that one effect of the 1984 amendment is that, in a joint invention, individual claims may be invented by different persons. It is, then, *possible* that Mr. Feldman alone invented the subject matter in Claims 5, 6, and 9–13 of the '500 patent and that, therefore, the Feldman patent is not prior art to those claims for purposes of an obviousness challenge.[9]

■ We turn to the facts offered by the parties, but with a short detour to determine who bears the burden of proof with regard to this motion. While it is true that Defendants bear the ultimate burden of proving that the '500 patent is invalid (and must do so by clear and convincing evidence), the current motion is Plaintiffs' and they, therefore, bear the burden of proving that there remain no genuine issues of material facts to forestall judgment. Importantly, however, "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202, 215 (1986). Thus, Plaintiffs' burden is to prove that there re-

main no genuine factual issues from which a jury could conclude, by clear and convincing evidence, that the Feldman patent is prior art to the asserted claims of the '500 patent. Defendants argue, however, that because Plaintiffs assert that Mr. Feldman alone invented that which is memorialized in Claims 5, 6, and 9–13, they should bear the burden on that issue. We disagree. An accused infringer seeking to invalidate claims of a patent bears the burden of proof by clear and convincing evidence. 35 U.S.C. § 282; *Scripps Clinic & Research Foundation v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed. Cir.1991). A party that bears the burden of proving an issue bears that burden with respect to each element of the issue; thus, in a civil battery case, because a harmful or offensive contact is an element of battery, a plaintiff seeking to meet his ultimate burden must prove by a preponderance of the evidence that such a contact occurred. *See generally,* Edward J. Devitt, Charles B. Blackmar & Michael A. Wolff, Federal Jury Practice and Instructions § 72.01 (1987 and supp.1993). Because one element in an obviousness analysis is proof of the scope and content of the prior art, *Graham v. John Deere, supra,* the burden of proving that the Feldman patent is prior art to the '500 patent rests with Defendants. As regards the Feldman patent and the asserted claims of the '500 patent, a necessary component of the determination of whether the Feldman patent is prior art is a determination of who invented that which is found in Claims 5, 6, and 9–13 of the '500 patent. We believe the burden of proof on that issue must also be on Defendants—and by the familiar clear and convincing evidence standard.[10]

9. This is in accord with one congressional purpose in enacting the 1984 amendments. Congress took note that inventions are increasingly the product of team efforts; the amendment sought to remove one hurdle to this process. *See* Fasse, *supra.*

10. Defendants offer *Application of Facius,* 408 F.2d 1396 (C.C.P.A.1969), and *Mendenhall v. Astec Indus., Inc.,* 13 U.S.P.Q.2d 1913, 1988 WL 188449 (E.D.Tenn.1988), to the contrary. As Plaintiffs point out in their reply brief, both of these cases involved distinguishable legal questions. Further, *Facius* antedated the 1984 amendment to § 116.

To the extent that Defendants invite us to place a burden on Plaintiffs to prove that Mr. Feldman

alone invented the matter in Claims 5, 6, and 9–13 of the '500 patent, we decline. The plain language and the legislative history of the 1984 amendment make clear congressional intent not to hinder joint invention by requiring each inventor to contribute to each claim (the "all claims" rule). Thus, we must consider the question of inventorship of each claim *tabula rasa.* Requiring joint inventors faced with an attempt to invalidate their patent to bear the burden of proving inventorship of each claim would run counter to the congressional design. We believe that the burden on this issue, as on the other issues comprising an invalidity analysis, must remain with Defendants.

Plaintiffs assert that the record is clear that Mr. Feldman is the sole inventor of Claims 5, 6, and 9–13 of the '500 patent. They argue that Mr. Dola's contribution to the patent is the specific embodiment of the opposed plates and spring means on the female bus bar that is disclosed in Figure 3 of the '500 patent. They contend, however, that none of the asserted claims is limited to this configuration. Thus, they maintain that Mr. Feldman alone invented that which is in Claims 5, 6, and 9–13 and that Mr. Dola contributed to the overall patent by providing one example of how the claimed invention might be realized.

Plaintiffs buttress their argument with declarations of both inventors. *See* Declaration of Steven Feldman at ¶ 6; Declaration of Frank Dola at ¶ 5. Plaintiffs contend that the asserted claims require only an electrical connector with a ground bus comprised of mateable male and female halves and multiple solder tails extending across the width of the male and female halves of the ground bus. They point to Mr. Dola's deposition in which he indicated that he worked only on a spring portion on the top of the connector, while the solder tails formed part of the bottom of the connector. *See* Deposition of Frank Dola at 23–24. They also offer Mr. Feldman's deposition in which he asserts that he prepared a sketch of the connector that included multiple solder tails before Mr. Dola became involved in the project. *See* Deposition of Steven Feldman at 33–36.

■ Defendants respond that Claims 5 and 9 (and, because they are dependant, Claims 6 and 10–13) include "means plus function" language that implicates the sixth paragraph of 35 U.S.C. § 112. That paragraph is as follows:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

The effect of "means plus function" language is to incorporate into the limitations of the claim the embodiment disclosed in the speci-fication and all equivalents of it. *In re Donaldson Co.*, 16 F.3d 1189 (Fed.Cir.1994) (*en banc*). Defendants argue from this that, because the asserted claims include "means plus function" language and because Plaintiffs admit that Dola contributed to the specification in the '500 patent, Dola must be a joint inventor of the asserted claims.

■ Congress amended § 112 in 1952 to add the cited paragraph. Its purpose is to allow patent drafters to define an element of a patent in terms of its function rather than its structure. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1536 (Fed.Cir.1991). For example, in *Laitram*, the court reviewed patent language regarding a conveyor belt. The language in question read:

... said belt comprising:

\* \* \* \* \* \*

[2] means for joining said pluralities to one another so that the axes of said holes of said first plurality are arranged coaxially and the axes of respective holes of both pluralities of link ends are substantially parallel;

939 F.2d at 1535. The district court concluded that the inclusion of structural language precluded application of paragraph six of § 112, *see* 15 U.S.P.Q.2d 1161, 1990 WL 71418 (E.D.Wisc.1990), but the Federal Circuit reversed.

The recitation of some structure in a means plus function element does not preclude the applicability of section 112(6). For example, in this case, the structural description in the joining means clause merely serves to further specify the function of that means. The recited structure tells only what the means-for-joining *does*, not what it *is* structurally.

939 F.2d at 1536. Thus, "means plus function" language may be present despite the appearance of structural language so long as the structural language merely defines the function.

The language at issue in the '500 patent is as follows:

5. An electrical connector assembly comprising mating male and female connectors for use in establishing interconnections to

a printed circuit board, each connector comprising:

\* \* \* \* \* \*

*bus solder tail means* within the second plane formed as extensions of the bus and extending across the width of the bus constituting both the *means for mounting the bus to the printed circuit board* as well as *the means for securing the housing to the printed circuit board,* the connector assembly being characterized by a male bus in one connector and a female bus in the other connector, the male and female busses each being provided with a plurality of solder tails extending across the width of each bus.

9. An electrical connector for use in establishing interconnections between printed circuit boards comprising:

\* \* \* \* \* \*

a planar, elongate, electrically conductive element attached to the housing in a second plane parallel with the first plane and electrical terminals, *the electrically conductive element* being attached between the printed circuit boards *for constituting an additional means for establishing an electrical coupling between the printed circuit boards;* and

*solder tails* located within the second plane extending from edge to edge across the width of the electrically conductive element and *constituting both the means for mounting the electrically conductive element to the printed circuit boards* as well as *the means for securing the housing to the printed circuit boards,* characterized in that the housing, electrical terminals, and electrically conductive element are each formed of mateable male and female halves.

(emphasis added). We agree with Plaintiffs that this language is distinguishable from that recognized by the Federal Circuit and other courts as "means plus function" language.[11] In those cases in which claim language is construed to be "means plus function" language, the language refers to an indefinite structure, defining it only by what function it will perform. *See Laitram,* 939 F.2d at 1535–36. In the '500 patent, the language refers to very specific structures ("bus solder tail means," "the electronically conductive element," and "solder tails") and then describes their functions.

The distinction we make is in accord with the Federal Circuit's interpretation of the legislative intent of § 112 par. 6. In 1946, the U.S. Supreme Court held that "means plus function" language was overbroad, ambiguous, and inconsonant with the patent laws. *Halliburton Oil Well Cementing Co. v. Walker,* 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3 (1946). Thus, in 1952, Congress amended § 112 specifically to allow "means plus function" language. *See Valmont Industries, Inc. v. Reinke Manufacturing Co., Inc.,* 983 F.2d 1039, 1042 (Fed.Cir.1993). However, to prevent the overbreadth and ambiguity about which the Supreme Court admonished, Congress added the limitation of the second clause of the new paragraph: that the "means plus function" language refer only to the structure disclosed in the specification or its equivalent. *Id.* In the instant case, the language of Claim 5 is not indefinite because it requires "bus solder tail means" rather than just any means to accomplish the function of "mounting the bus to the printed circuit board" and "securing the housing to the printed circuit board." The language of Claim 9 is even more definite, requiring "the electrically conductive element" to "constitut[e] an additional means for establishing an electrical coupling between the printed circuit boards" and "solder tails" to "constitut[e] both the means for mounting the electrically conductive element to the printed circuit boards [and] the means for securing the housing to the printed circuit boards …"

**11.** *See, e.g., In re Bond,* 910 F.2d 831 (Fed.Cir. 1990) (claim language "delay means included in said control means for delaying the seizure of said telephone line by said second circuit means for a predetermined time interval …" held to be "means plus function" language); *Interspiro USA, Inc. v. Figgie International, Inc.,* 18 F.3d 927 (Fed.Cir.1994) (claim language "means for establishing gauge pressure" held to be "means plus function" language); *but see, Quantum Corp. v. Mountain Computer, Inc.,* 5 U.S.P.Q.2d 1103, 1987 WL 45645 (N.D.Cal.1987) (claim language "… and correction signal generator means connected to said sample and hold circuit for generating an offset signal …" held not to be "means plus function" language).

In conclusion, despite the use of the term "means" and the subsequent description of function, neither Claim 5 nor Claim 9 contains "means plus function" language as contemplated by 35 U.S.C. § 112 par. 6. As such, the specification is not incorporated into the language of the claims and Mr. Dola may not be considered a joint inventor of Claims 5, 6, and 9–13 on this ground.

Defendants alternately argue that there remains a genuine issue about whether Mr. Feldman alone invented the subject matter in Claims 5 and 9—even if we do not read those claims to include the features of the specification and Figure 3 of the '500 patent. Both Mr. Feldman and Mr. Dola have testified under oath that Mr. Dola had nothing to do with the invention of what is in Claims 5 and 9; however, Defendants argue that there is ample case law to the effect that the uncorroborated testimony of inventors is not to be credited. Defendants then contend that the only contemporaneous sketches offered by Plaintiffs to support the sole-inventor assertion do not depict what Plaintiffs suggest they depict and can not, therefore, corroborate Mr. Feldman and Mr. Dola.

▆▆▆▆ It is true that in some contexts an inventor's statement about the conception of his invention must be corroborated. *See, e.g., Price v. Symsek,* 988 F.2d 1187, 1194–96 (Fed.Cir.1993) (corroboration required to prove earlier date of conception); *Hahn v. Wong,* 892 F.2d 1028, 1032–33 (Fed.Cir.1989) (same). Plaintiffs point out that virtually all of the cases that require corroboration involve inventors attempting to claim an earlier date of conception than the filing date of a patent. *See, e.g., Price, supra.* While this is true, the reasoning underlying the rule is not so limited.

Conception by an inventor, for the purpose of establishing priority, can not be proved by his mere allegation nor by his unsupported testimony where there has been no disclosure to others or embodiment of the invention in some clearly perceptible form, such as drawings or model, with sufficient proof of identity in point of time. For otherwise such facile means of establishing priority of invention would, in many cases, offer great temptation to perjury, and would have the effect of virtually precluding the adverse party from the possibility of rebutting such evidence.

*Mergenthaler v. Scudder,* 11 App.D.C. 264, 278 (D.C.Cir.1897), *quoted in Price,* 988 F.2d at 1194. The principle of the cases seems to be that, because conception and invention occur uniquely within the mind of the inventor, there is little to prevent an inventor who is challenged about details of his conception from being less than truthful—particularly because his opponent can not delve into the inventor's mental processes to prove the inventor's deceit. While we do not in any way impugn the integrity of Mr. Feldman and Mr. Dola, we believe the principle of *Mergenthaler* to be equally applicable to a claim by alleged joint inventors that the subject matter of certain claims was the product of just one inventor. Thus, we hold that the assertions of Mr. Feldman and Mr. Dola must be corroborated to be given weight.[12]

We then query whether Plaintiffs have offered corroborating evidence so as to meet their burden of proving that there is no genuine issue of material fact. Fed.R.Civ.P. 56. Plaintiffs offer the sketches discussed previously, sketches that were attached to Mr. Feldman's August 6, 1985, PID. That drawing shows a microstrip electrical connector having a ground bus comprised of mateable male and female halves. *See* Figure 1.

---

**12.** Plaintiffs counter that "[e]ven if corroboration were required, because Dola was *not* an inventor of the asserted claims, he can and did corroborate Feldman's prior invention of the subject matter in the asserted claims." Reply Memorandum at 7. This is circular reasoning in that Plaintiffs ask that we assume the conclusion in order to find corroboration of that conclusion.

**Figure 1**

Defendants respond that the PID sketch is missing one of the elements required in Claims 5 and 9, namely that there be a plurality of solder tails extending across the width of the female bus. Plaintiffs do not dispute this point and we find that it has merit. The only answer Plaintiffs give is that, after the August 6, 1985, PID sketch, Mr. Feldman conceived of the idea of having multiple solder tails extending across the female bus bar. *See* Feldman Depo. at 33–34. However, Mr. Feldman concedes in his declaration that he can not now find any sketches to prove this assertion. *See* Feldman Declaration at ¶ 6. As such, we are left with the as-yet uncorroborated statement of an inventor regarding the nature and timing of his conception; as we have explained, we can give no independent weight to such evidence.

In a motion for summary judgment, the movant bears the initial burden of producing competent evidence to show that there are no remaining genuine issues of material fact to warrant trial. As regards the prior art status of the Feldman patent, however, Plaintiffs have not met their initial burden of proving that Mr. Feldman alone invented that which is in Claims 5 and 9 of the '500 patent. Of course, this conclusion does not mean that Defendants will necessarily be able to prove the converse—that Mr. Dola was a joint inventor of those claims so that the Feldman patent is prior art under 35 U.S.C. § 102(b)—at trial. Nonetheless, we will deny Plaintiffs' motion as it regards the Feldman patent.

C. *Defendants' Motion for Partial Summary Judgment of Noninfringement of Claim 5 of the '500 Patent*

■■■ Defendants argue that the Fujitsu 260 connector, the allegedly infringing product, does not infringe Claim 5 of the patent. Because questions of infringement invariably involve determinations of fact, we must approach this issue with particular care. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d

1107 (Fed.Cir.1985). The burden of proving infringement lies with Plaintiffs and that burden must be met by a preponderance of the evidence. *Mannesmann Demag Corp. v. Engineered Metal Products Co.,* 793 F.2d 1279 (Fed.Cir.1986).

■ To prove infringement, a patent holder need only demonstrate that the product of another embodies every element of any single patent claim. *Lemelson v. United States,* 752 F.2d 1538, 1551 (Fed.Cir.1985). At the summary judgment stage, however, the Federal Circuit has repeatedly cautioned district courts to approach with care the issue of infringement.

It is at least conceivable that comparison of a properly interpreted claim with a stipulated or uncontested description of an accused device or process would reflect such an absence of material fact issue[s] as to warrant summary judgment of infringement or noninfringement. Because infringement is itself a fact issue, however, a motion for summary judgment of infringement should be approached with a care apportioned to the likelihood of its being inappropriate.

*D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570 (Fed.Cir.1985). The proper analysis is twofold, requiring us first to interpret the claims of the patent and then to compare them with the allegedly infringing product. *Chemical Engineering Corp. v. Essef Indus., Inc.,* 795 F.2d 1565 (Fed.Cir.1986). Only if there are no material facts remaining regarding the patent claim construction and the allegedly infringing product may we grant summary judgment of infringement or noninfringement.

■ Ordinarily, where the patent claims are susceptible to interpretation without expert assistance, claim interpretation is a matter of law. *Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1387 (Fed.Cir. 1992). As discussed, the invention at issue in this case is not readily understood without expert assistance and so we note that Defendants bear a particularly heavy burden in seeking summary judgment of noninfringement.

Claim 5 calls for an electrical connector with "a planar, elongate, electrically conductive ground bus mounted within a bus passage ... for constituting a reference plane for the microstrip configured transmission of electric signals by the terminals ..." Defendants argue that (1) the accused Fujitsu product is not a microstrip connector and (2) if it is, then so is a 1974 Fujitsu connector (the "Fujitsu 81") such that Claim 5 is invalid as anticipated under 35 U.S.C. § 102(b).

The '500 patent, in its background section, defines "microstrip" as "characterized by a reference or ground plane on one side only of, and parallel with, the signal carrying conductors." *See* '500 Patent at Col. 1, lines 42–45. It likewise defines "stripline" geometry (another variation) as "similar to microstrip but employ[ing] two parallel reference or ground planes with the signal carrying conductors parallel to one another and between the ground planes." *Id.* at lines 45–58.

Defendants contend that, by the terms of the '500 patent, the accused Fujitsu 260 connector is stripline and, therefore, not infringing on Claim 5. Defendants point primarily to a single distinguishing characteristic: while a microstrip connector like that in the '500 patent contains a ground plane on one side only, a stripline connector like that allegedly in the Fujitsu 260 connector contains *two* ground planes with signal-carrying conductors sandwiched between them.

Defendants therefore argue that because Claim 5 is limited to a microstrip connector and the Fujitsu 260 has a stripline geometry, the Fujitsu product can not literally infringe Claim 5.[13] Defendants further argue that Plaintiffs can not argue that the Fujitsu 260 has a microstrip geometry without risking its invalidation. They contend that the 1974 Fujitsu 81 connector, first sold in the United States in 1979, included all of the elements of

---

**13.** Actually, because Plaintiffs contend that the Fujitsu 260 is not a true stripline connector, Defendants' argument is better phrased as: the Fujitsu 260 is anything but a microstrip connector and, therefore, does not infringe.

Claim 5 and had the same configuration as the Fujitsu 260. Thus, if the Fujitsu 260 has a microstrip geometry, the Fujitsu 81 would have anticipated every element of Claim 5 and would render that claim invalid. Defendants argue that this places Plaintiffs squarely between Scylla and Charybdis.

Plaintiffs offer several arguments to counter the motion. First, they note that the description of microstrip and stripline connectors is in that section of the '500 patent called "Background of the Invention" and therefore does not set out the limits of the claims. Second, they argue that the description only considers one difference between microstrip and stripline geometry and people skilled in the art would understand that to properly identify a microstrip connector, an observer must consider both structure and function.

Third, and most important, they contend that the Fujitsu 260 connector is, in fact, not a stripline connector because one of the grounds is connected to only the male half of the connector—and to be stripline, the ground would have to be connected to both halves.

Plaintiffs also argue that the older product, the Fujitsu 81, does not include certain other elements of Claim 5 and so, regardless of the microstrip/stripline question, it could not invalidate Claim 5 of the '500 patent.

Defendants reply that Plaintiffs' argument that the Fujitsu 260 connector is not stripline is almost irrelevant because, to prove infringement, Plaintiffs must prove not that the Fujitsu 260 is *not* stripline but that it *is* microstrip. We agree. Thus, if the Fujitsu 260 is anything but microstrip, it does not literally infringe Claim 5.

We have reviewed carefully the arguments and declarations submitted by the parties. We regard there to be remaining issues of material fact that preclude summary judgment on the literal infringement issue.

While it is clear that Plaintiffs will bear the burden at trial of proving that the Fujitsu 260 connector is a microstrip connector, Defendants have not met their current burden of proving that Plaintiffs can not meet their trial burden. We find that Plaintiffs have shown there to be a factual question regarding precisely what defines a microstrip connector. Although Defendants' expert asserts that the additional ground plane makes the Fujitsu 260 not microstrip, we are cognizant of Plaintiffs' argument that several factors govern the determination of whether a connector is microstrip such that the number of ground planes might not be determinative. Further, Plaintiffs argue that what Defendants call the second ground plane in the Fujitsu 260 connector is not, in reality, a ground plane as defined in the art. Thus, there is a factual question regarding how many ground planes are part of the Fujitsu 260.

Bearing in mind the rigorous standard for granting summary judgment on infringement issues, *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570 (Fed.Cir.1985), we must deny the current motion as it regards literal infringement. In reviewing Plaintiffs' opposition brief, however, we note that they have not addressed Defendants' contention that the Fujitsu 260 does not infringe Claim 5 of the '500 patent by equivalents. Thus, by virtue of Local Rule 7.6 and our review of the merits of Defendants' argument, we will grant that portion of the motion.

D. *Defendants' Motion for Partial Summary Judgment of Noninfringement of Claim 9 of the '500 Patent*

 Defendants argue that the Fujitsu 260 connector does not infringe Claim 9 of the '500 patent either literally or by equivalents. We consider the two issues *seriatim*.

1. *Literal Infringement*

Claim 9 of the '500 patent calls for

An electrical connector for use in establishing interconnections between printed circuit boards comprising:

a housing of insulative material ...

\* \* \* \* \* \*

... characterized in that the housing, electrical terminals, and electrically conductive elements are each formed of mateable male and female halves.

It is important to make a distinction here: there are several male-female connections called for in the '500 patent; in the present motion, we address only the requirement that the housing of insulative material be comprised of mateable male-female parts. *See* Figure 2.[14]

**Figure 2**

Defendants argue that the Fujitsu 260 connector does not literally infringe Claim 9 of the '500 patent because the Fujitsu 260 insulative housing does not include mateable

male-female connections. Rather, Defendants contend, the Fujitsu 260's insulative housing has two parts that simply abut one another without being mateable in the male-female sense. *See* Figure 3.[15]

14. In Figure 2, the two halves of the '500 patent connector are shown. *The upper half includes* insulative housing in a female configuration (the housing is shaded and indicated by the number "40"). The lower half includes insulative housing in a male configuration (the housing is shaded and indicated by the number "14").

15. In Figure 3, the two halves of what Defendants allege to be the insulative housing are the

dark-shaded portion on the bottom and the hash-marked portion on the top. Defendants argue that the dark-shaded segments that adjoin the hash-marked areas (marked with the number "5") are not part of the insulative housing.

*Figure 3*

If we assume, *arguendo*, that the insulative housing in the Fujitsu 260 is only what Defendants assert that it is, it is clear that the Fujitsu 260 insulative housing is not in a mateable male-female configuration. Rather, the two pieces simply press against one another, with no part of either half penetrating the surface of the other half.[16]

Plaintiffs do not dispute this conclusion. However, they take issue with how Defendants define the "insulative housing" portion of the Fujitsu 260. It is undisputed that the outer ground shell of the Fujitsu 260 is coated with insulative paint. *See* Declaration of

John L. Grant at ¶ 20 (Defendants' expert). The outer ground shell is the portion in Figure 3 marked with the number "5." Thus, Plaintiffs argue that the insulative material in the Fujitsu 260 is the entire dark-shaded portion of Figure 3. If that were so, the two halves of the insulative housing would mate in a male-female configuration (with the hash-marked portion being male and the dark-shaded portion being female).

The issue, then, is a relatively narrow one: if the painted outer ground shell is part of the insulative material, Defendants' motion must be denied. If the painted outer ground

---

16. Male-female mating in this technical setting is essentially the same as in common use. One of the inventors of the '500 patent, Mr. Feldman, confirmed this in his deposition.

 A Mateable would be in the human biological sense where one part fits into another.

 Q If we think of two housings where the end walls of the housings—the housing portions

abut, as opposed to having one housing portion penetrate a surface of another; is abutting contact across the face of the housings mateable contact?

 A No, I don't think so.

Feldman Depo. at 111–12.

shell is not part of the insulative material, the motion must be granted.

Defendants' expert, John Grant, asserts that the painted portion can not properly be considered part of the insulative material on the Fujitsu 260.

> The outer ground shell of the Fujitsu 260 connector affects the electrical properties of the Fujitsu 260 connector.... The outer ground shell of the Fujitsu 260 connector is coated with an insulative paint. However, this insulative coating does not affect either the purpose or functioning of the shell as a ground shell. The shell serves as a ground because it is conductive and connected to the central ground bus by the "shell-bus connection" shown in Exhibit F. Also, the coating cannot be said to render the shell part of an insulative housing because an insulative housing, or any insulative material for that matter, cannot be maintained at zero volts or "grounded." Only conductive materials can be grounded.

Grant Declaration at ¶¶ 19 and 20.

Plaintiffs' expert, J. Brian Williamson, argues that

> In my opinion, the FCN–260 connector does have a housing of insulative material that is formed of mateable male and female halves. The language of claim 9 requiring "a housing of insulative material ... characterized in that the housing [is] formed of mateable male and female halves" is not limited to the specific embodiment of the male-female housing shown in Fig. 4 of the '500 patent.

Declaration of J. Brian P. Williamson at ¶ 12. Dr. Williamson goes on to note that the outer ground shell in the Fujitsu 260 connector performs the same mechanical function as the insulated housing in the '500 connector.

*We are appropriately reluctant to grant* summary judgment on an issue of infringement. *D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570 (Fed.Cir.1985). However, we believe it appropriate in this circumstance.

▮▮▮▮ As we have noted, an infringement analysis requires a two-step inquiry: a court must first interpret the claims of the patent to give them their proper scope and it must then compare the claims to the allegedly infringing product. *Chemical Engineering Corp. v. Essef Indus., Inc.,* 795 F.2d 1565 (Fed.Cir.1986). The sequence is crucial because claim construction "is necessary to define the metes and bounds of the protection afforded by the claims." *P.M. Palumbo, et al v. Don–Joy Co, et al,* 762 F.2d 969, 974 (Fed.Cir.1985). Further, claim construction is a matter of law. *Id.*

In the instant case, Claim 9 of the '500 patent calls for "a housing of insulative material" and for housing in a mateable male-female configuration. We interpret this to mean that the housing itself, that part which forms the male-female connection, is comprised of an insulative material. Common sense dictates such a result. Thus, we compare Claim 9, requiring mateable male-female housing made of insulative material, to the Fujitsu 260. Plaintiffs do not dispute that the portion of the Fujitsu 260 that seems to form a mateable male-female configuration is comprised of metal coated with insulative paint. Plaintiffs assert that, because of the insulative paint, the metal outer ground shell is housing made of insulative material. We disagree. The housing itself—that substantive material that surrounds the connector—is metal, which is a conductive material. To say that, because it is coated with an insulative paint, the outer ground shell is made of an insulative material is akin to saying that, because it is covered with fleece, a sheep is made of wool.

We have determined, as a matter of law, that Claim 9 is limited to housing of insulative material; that, taken with the undisputed fact that the outer ground shell of the Fujitsu 260 connector is metal, warrants entry of summary judgment that the Fujitsu 260 connector does not literally infringe Claim 9 of the '500 patent.

### 2. Infringement by Equivalents

Defendants also seek partial summary judgment that the Fujitsu 260 does not infringe Claim 9 by equivalents.

▮▮▮▮ The doctrine of equivalents allows a finding of infringement, even in the absence of literal infringement, where "an accused device performs substantially the

same function in substantially the same way to achieve substantially the same result" as in a claim of a patent. *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538 (Fed. Cir.1991). The primary policy behind the doctrine is to prevent parties from making a device with minor, insubstantial differences from a patented product and thus avoiding infringement. As the Federal Circuit aptly stated in *London,* "[a]lthough designing or inventing around patents to make new inventions is encouraged, piracy is not." *Id.* Importantly, application of the doctrine is the exception rather than the rule. *Id.*

Defendants contend that there is nothing in this case to warrant application of the doctrine of equivalents. Plaintiffs answer that the record is replete with evidence that Fujitsu sought to copy the AMP '500 connector and that, therefore, the possibility of piracy is great. While we do not suggest that Plaintiffs have proven copying, we do allow that they have raised a genuine issue of material fact such that we can not say, as a matter of law, the an equivalents analysis is unwarranted.

Defendants argue that the insulative housing described in Claim 9 performs only insulative and mechanical functions, the mechanical function being to hold the two mateable parts of the connector together and to protect the internal conductors. Defendants assert that the outer ground shell of the Fujitsu 260 performs a different function, that being to affect the electrical properties of the connector. *See* Grant Declaration at ¶ 19 ("the outer ground shell measurably affects both the "impedance" and "cross-talk" of the connector"). Thus, they contend, the two structures do not perform substantially the same function.

Plaintiffs respond that infringement by equivalents is "not precluded merely because the accused device performs functions in addition to those performed by the claimed device." *Insta-Foam Prod. v. Universal*

*Foam Systems,* 906 F.2d 698, 702 (Fed.Cir. 1990). We agree that the Fujitsu 260 infringes on Claim 9 by equivalents if every element of Claim 9 or its equivalent is found in the Fujitsu 260 connector. However, Defendants answer that one of the functions of the housing in Claim 9 is to insulate and there is no evidence that the outer ground shell of the Fujitsu 260 insulates (indeed, it is made of metal and is, therefore, conductive). *See* '500 patent, col. 13, lines 10–21. Plaintiffs reply to this argument by asserting that the insulative material described in column 13 is best regarded as part of a different structure and that the insulated housing structure that should be compared to the outer ground shell of the Fujitsu 260 connector serves only a mechanical purpose.

We have reviewed at length the submissions on this issue and must conclude that Defendants have not met their burden of proving that there are no genuine issues of material fact remaining. Specifically, it is not clear which portion of the housing structure described in Claim 9 must be compared to the outer ground shell of the Fujitsu 260 patent.[17] We must deny the motion as it regards the doctrine of equivalents.

E. *Defendants' Motion for Partial Summary Judgment of Noninfringement of Claims 6 and 10–13 of the '500 Patent*

Claims 6 and 10–13 are dependent claims; Claim 6 depends upon Claim 5 and Claims 10–13 depends upon Claim 9. Defendants ask that, to the extent we conclude that the independent claims were not infringed, we enter summary judgment of non-infringement of the dependent claims.

A dependent claim essentially incorporates by reference all of the elements of the claim on which it depends. *London,* 946 F.2d at 1539. Thus, one who does not infringe the independent claim can not, by definition, infringe the dependent claims.

17. Plaintiffs' expert, Dr. Williamson, indicates that the housing referred to in Claim 9 serves only a mechanical function. Williamson Declaration at ¶ 16. He argues that Defendants and their expert, Mr. Grant, err in including the insulative material described in column 13 as part of the housing. Indeed, he claims that portions of the Fujitsu 260 housing actually perform the function described in column 13 of the '500 patent of isolating the ground bus segments. *Id.* at ¶ 20.

*Id.; Wilson Sporting Goods Co. v. David Geoffrey & Assoc.,* 904 F.2d 677, 686 (Fed. Cir.1990).

Plaintiffs do not argue this legal point. Rather, they reiterate their argument that the Fujitsu 260 connector infringes Claims 5 and 9 and assert that the Fujitsu product also includes the additional elements of Claims 6 and 10–13.[18] Because we have already determined that we should grant summary judgment that the Fujitsu 260 connector does not infringe Claim 5 by equivalents or Claim 9 literally, it is an appropriate legal extension to enter summary judgment that the Fujitsu 260 connector does not infringe Claim 6 by equivalents or Claims 10–13 literally. We shall do so.

F. *Defendants' Motion to Determine That Certain Documents Are Not Privileged and Plaintiffs' Motion for Protective Order*

There remain two discovery matters. On July 27, 1993, the parties entered into a protective order that provided, *inter alia,* that a party that inadvertently produced material subject to the attorney-client privilege or the work-product immunity could request return of the documents within 30 days without being subject to a claim of waiver. *See* Protective Order at ¶ 10. In August, 1993, Plaintiffs apparently inadvertently produced five documents that they now contend are privileged.[19] Plaintiffs have filed a motion for a protective order with regard to two of those documents. Defendants have filed a counter motion seeking a ruling that all five are not privileged.

 The party seeking to invoke the work product doctrine or attorney-client privilege bears the burden of proof. *In re Grand Jury,* 603 F.2d 469, 474 (3d Cir.1979); *see also, Bulk Lift Int'l, Inc. v. Flexcon & Systems, Inc., et al,* 122 F.R.D. 482, 490 (W.D.La.1988). The attorney-client privilege applies if

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication is made (a) is a member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*In re Grand Jury Investigation,* 599 F.2d 1224, 1233 (3d Cir.1979). Work product immunity protects the thoughts, mental impressions, and theories of counsel in anticipation of trial. *See McNeil–PPC, Inc. v. Procter & Gamble Co.,* 136 F.R.D. 666, 671 (D.Colo. 1991). The doctrine is set forth in Fed. R.Civ.P. 26(b)(3).

... a party may obtain discovery of documents and tangible things otherwise discoverable ... *and prepared in anticipation of litigation or for trial* by or for another party or by or for that other party's representative ... only upon a showing that the party seeking discovery has substantial need of the materials ... In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

(emphasis added).

Having briefly set forth the appropriate analytic framework, we will consider in turn the documents at issue.

1. *Memorandum Dated October 29, 1990, from Steve Feldman to O.K. Riley*

 Plaintiffs seek a protective order with respect to a memorandum from Mr.

---

18. There is an exception to the general independent/dependent infringement principle; *see Wilson Sporting Goods, supra;* but Plaintiffs do not raise it as an argument so we will not consider it here.

19. Our descriptions of the documents will be limited because Plaintiffs regard the documents as confidential, even if not privileged.

Feldman to Mr. O.K. Riley. *See* Exh. 5 to Defendants' Motion. As noted, Defendants argue that this document is not privileged and that it may be used by them in this litigation.

Plaintiffs describe the background of the document as follows. In October, 1990, James Trygg, an AMP attorney, requested of a Leon Ritchie, the general manager of AMP's advanced development department, that an investigation of a Japanese patent be conducted. *See* Declaration of James Trygg at ¶ 6. Later that month, Mr. Trygg received a copy of a memorandum written by Mr. Feldman, an engineer, to Orvel Riley. *Id.* at ¶ 8. *See* Exh. A to Declaration of Orvel Riley. Mr. Trygg indicates that the memorandum was prepared pursuant to his request and that he did so in anticipation of litigation and in order to give legal advice to AMP. Trygg Declaration at ¶ 6.

In reviewing the document and the declarations of the parties, we must conclude that Plaintiffs have failed to meet their burden. The only indication that the memorandum was prepared in order to give legal advice is the conclusory statement of Mr. Trygg. We can not give great weight to that declaration unless it is supported elsewhere in the record in some more substantive way. Mr. Feldman, the author, declares that he prepared the memorandum only because Mr. Trygg requested an investigation. *See* Declaration of Steven Feldman at ¶¶ 7 and 8. However, in-house counsel may serve dual functions, acting as both legal counsel and business counsel. The privilege applies only to the former. *See Kramer v. The Raymond Corp.*, No. 90-5026, 1992 WL 122856 (E.D.Pa. May 29, 1992). Here, Plaintiffs merely offer Mr. Trygg's conclusory statement that the memorandum was responsive to his request and that his request involved the rendering of legal advice. Further, Plaintiffs have not demonstrated that the memorandum was held in confidence by the AMP personnel involved. Given that the burden rests with Plaintiff, we must find that the attorney-client privilege does not apply to the Feldman memorandum. We reach the same result with regard to the work-product immunity. The time in which the memorandum was prepared was so remote in time (more than two years) from the inception of litigation that a connection seems questionable. Further, and more important, AMP was not aware that Fujitsu had developed the Fujitsu 260 connector until *after* the memorandum was written and distributed. We find that Plaintiffs have not met their burden with respect to the work-product immunity question.

### 2. *Memorandum Dated November 16, 1990, from Howard Blonder to O.K. Riley*

██ Plaintiffs also seek a protective order with regard to a November 16, 1990, memorandum from Howard Blonder to Orvel Riley. *See* Exh. 1 to Defendants' Motion.

It is clear that the attorney-client privilege does not apply to this document. Defendants contend, and Plaintiffs do not dispute, that the memorandum was not forwarded to AMP's counsel—or any other attorney. Thus, we can not conclude that the attorney-client privilege could attach to the memorandum.

Further, we do not find that the work-product immunity applies to this document. Like the Feldman memorandum, the Blonder memorandum was written long before AMP knew that Fujitsu had developed the Fujitsu 260 connector. Additionally, as noted, the Blonder memorandum was not forwarded to an attorney and, so, it seems unlikely that it constitutes an attorney's work product. We will deny Plaintiffs' motion.

### 3. *Defendants' Motion for a Ruling that Three Other Documents Are Not Privileged*

Our determination with regard to Plaintiffs' motion resolves, in part, Defendants' motion. There are three other documents, however, that Defendants claim should not be considered privileged.

The first is a one-page note from Fritz Raring, a now-deceased AMP patent agent, to Mr. Riley. *See* Exh. 2 to Defendants' Motion. Plaintiffs explain that this note is related to Mr. Trygg's request that there be an investigation into a Japanese patent. We have held that Plaintiffs failed to meet their burden to prove that the Feldman memoran-

dum, allegedly prepared in response to the same request, was privileged matter or work product. We conclude that Plaintiffs have similarly failed to meet their burden with respect to this document.

The second document is a facsimile transmission sheet that appears to be related to that same request by Mr. Trygg. *See* Exh. 3 to Defendants' Motion. For the same reason we described *ante,* we find that Plaintiffs have failed to meet their burden of showing that this document is privileged matter or work product.

The third document is a memorandum from Kiyotaka Okada to Mr. Trygg transmitting a copy of the Japanese Utility Model. *See* Exh. 4 to Defendants' Motion. The memorandum was dated October 30, 1990. We have reviewed carefully the filings of the parties and must again conclude that Plaintiffs have not met their burden of proving that the Okada memorandum should be considered attorney-client privileged matter or work product.

We will, then, grant Defendants' motion.

### G. *Plaintiffs' Motion to Compel*

 Finally, Plaintiffs have filed a motion to compel discovery.

On January 14, 1994, Plaintiffs served notice to Defendant Fujitsu Microelectronics, Inc. ("FMI"), that they would take a Fed. R.Civ.P. 30(b)(6) deposition on January 27, 1994, and that there would be 25 topics at issue. By letter of January 26, 1994, Defendants informed Plaintiffs that they would be able to provide a witness to address only three of the 25 topics because the other topics required knowledge FMI did not have. Plaintiffs now move to compel.

The topics deal largely with the contentions and affirmative defenses detailed in Defendants' answer and counterclaim. While it would seem reasonable to expect that a party that asserts that certain defenses are available to it would be able to provide a witness to testify to the factual bases for those defenses, Defendants argue that that is not so here. Their argument is based on the distinction between Fujitsu Limited, the par-

ent corporation, and FMI, a marketing and sales representative for Fujitsu Limited. FMI asserts that it conferred with Fujitsu Limited in preparing its answer and counterclaim but that the factual bases for much of the answer and counterclaim is in the possession of Fujitsu Limited.[20]

Fed.R.Civ.P. 30(b)(6) requires a corporation served with a deposition notice to provide a witness to testify to matters "known or reasonably available" to the corporation. Having reviewed the cases proffered by the parties, we admit that it is difficult to determine precisely what "reasonably available" to the organization means. In the end, we return to the fact that FMI included certain contentions and counterclaims in its answer. It is not unreasonable to conclude that someone at FMI believed there were factual bases for such assertions. We will grant Plaintiffs' motion and require FMI to provide an appropriate witness.

We will issue an appropriate order.

### ORDER

AND NOW, this 25th day of April, 1994, upon consideration of the motions of the parties, it is ordered that:

1. Defendants' motion for partial summary judgment that Claims 5 and 9 of the '500 patent are invalid according to 35 U.S.C. § 103 is **denied.**

2. Plaintiffs' motion for summary judgment (or adjudication) that the asserted claims of the '500 patent are not invalid under 35 U.S.C. § 103 is **granted in part.** It is held that the Fall, 1985, AMP presentations do not constitute prior art as to the '500 patent. The motion is **denied** in all other respects.

3. Defendants' motion for partial summary judgment that the Fujitsu 260 connector does not infringe Claim 5 of the '500 patent is **granted in part.** It is held that the Fujitsu 260 connector does not infringe Claim 5 of the '500 patent by equivalents. The motion is **denied** in all other respects.

4. Defendants' motion for partial summary judgment that the Fujitsu 260 con-

**20.** FMI also notes that Plaintiffs noticed a deposition of Fujitsu Limited in Tokyo but canceled it.

nector does not infringe Claim 9 of the '500 patent is **granted in part.** It is held that the Fujitsu 260 connector does not literally infringe Claim 9 of the '500 patent. The motion is **denied** in all other respects.

5. Defendants' motion for partial summary judgment that the Fujitsu 260 connector does not infringe Claims 6 and 10–13 of the '500 patent is **granted in part.** It is held that the Fujitsu 260 connector does not infringe Claim 6 of the '500 patent by equivalents. It is further held that the Fujitsu 260 connector does not infringe Claims 10–13 of the '500 patent literally. The motion is **denied** in all other respects.

6. Plaintiffs' motion for a protective order is **denied.**

7. Defendants' motion for a ruling that certain documents are not privileged is **granted.**

8. Plaintiffs' motion to compel is **granted** and Fujitsu Microelectronics, Inc., shall provide a witness in accordance with Fed. R.Civ.P. 30(b)(6) to comply with the deposition notice dated January 14, 1994.